Filed 2/10/15  Indulkar v. East Desert Valley Investments CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ANIL INDULKAR, as Trustee, etc., et al., | |
| Plaintiffs and Appellants, | G050400 |
| v. | (Super. Ct. No. RIC498040) |
| EAST DESERT VALLEY INVESTMENTS, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Riverside County, Harold W. Hopp, Judge.  Affirmed.

Law Offices of Lawrence R. Bynum and Lawrence R. Bynum for Plaintiffs and Appellants.

Borton Petrini and Daniel L. Ferguson for Defendants and Respondents.

\*          \*          \*

The parties involved in the matter before us have been doing business together, and litigating against each other, for years. Plaintiff and appellant Anil Indulkar, as trustee of four trusts (appellant), alleged in the action before us that defendants and respondents East Desert Valley Investments, Inc. (East Desert), Vinod Kaura, and Veena Kaura (collectively, respondents), deprived him of his ownership interest in East Desert and of his share of the proceeds of a refinance of certain apartment property owned by East Desert (*Indulkar v. East Desert Valley Investments, Inc.* (Super Ct. Riverside County, 2012, No. 498040)) (Present Action). The trial court held that appellant either litigated or had every opportunity to litigate, these issues in a prior lawsuit settled in 2005 (*Indulkar v. Kaura* (Super. Ct. San Diego County, 2005, No. 835576)) (San Diego Action), and that his claims were barred by the statute of limitations.

Appellant claims the court erred in applying the doctrine of res judicata and the statute of limitations in granting respondents' motions for judgment on the pleadings and in awarding attorney fees to respondents pursuant to the settlement agreement in the San Diego Action. We agree with respondents that the doctrine of res judicata bars the Present Action. That being the case, we need not address whether the statute of limitations also bars the Present Action. We affirm the judgment. We do not address appellant's challenge to the attorney fees award, inasmuch as we have no jurisdiction to do so.

I

FACTS

The judgment before us arises out of respondents' Code of Civil Procedure section 631.8 motions for judgment on the pleadings with respect to bifurcated issues. The parties submitted to the court what they termed a "Joint Statement of Undisputed

2

Facts" for the court's consideration in evaluating the motions, in addition to each party's offer of proof and exhibits. The "Joint Statement of Undisputed Facts" contained two lists of facts, one proffered by each party. They were characterized as "undisputed" only for the purposes of the motions, and were intended to be subject to proof should a trial follow. The following facts are taken from appellant's proffered statement of undisputed facts.

Anil Indulkar and his wife, Gouri, engaged in certain business ventures with Vinod and Veena Kaura.[1] Those included at least three real property ventures, two of which were in California. At one point, an apartment complex known as Mollison Elms, located in El Cajon, was purchased. Because they had trouble making the debt payments on the Mollison Elms property, the parties decided to transfer their respective interests in the property to Anil Indulkar's pension plan. As part of the transaction, the Kauras deeded their interest in the property to Anil G. Indulkar Pharmacist, a professional corporation. The senior lender then foreclosed its deed of trust securing the debt.

The parties formed East Desert, a Nevada corporation, to purchase Mollison Elms back from the lender. The pension plans of the Indulkars and the Kauras provided the funds for East Desert to make the purchase. The 1995 tax return for East Desert showed that four Indulkar retirement trust interests collectively owned 15.004

---

[1] From time to time, we identify the parties by their first names for ease of reference. We mean no disrespect. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn.2.)

3

percent of the company and four Kaura retirement trust interests collectively owned 15.162 percent of the company.[2]

While the Indulkars were in India for an extended period of time, the Kauras started taking control of East Desert. Indeed, the 2003 East Desert tax return that showed Rita Kalra, a Kaura family friend, owned 49.834 percent and the Kauras' daughter, Samantha, then owned 20 percent. This was so even though Samantha did not contribute any capital for her shares.

"Unbeknownst to the Indulkars, [Attorney] DePhillips initiated a complaint against the Kauras on September 10, 2004, in San Diego." In either September or October that year, Anil Indulkar returned to the United States in connection with his pharmacy business. After Anil returned to the United States, the police in India picked up Gouri and took her to the police station, where she was held for questioning for nine hours. She was not released until she signed a confession admitting charges in a criminal complaint brought by Veena Kaura. Thereafter, the police called Gouri at home every day and continued to pick her up and take her to the police station. Veena had bribed the police commissioner.

Gouri was calling Anil in the United States every day, crying and telling him to do whatever he had to do to keep the police from putting her in jail. In January and February, 2005, Anil met with the Kauras to discuss the matter and Veena threatened Anil that if he did not agree to her terms, Gouri would be thrown in jail. Anil agreed to

---

[2] The owners were described as: "Anil Indulkar A PC retirement trust FBO Anil Indulkar" and "Anil Indulkar retirement trust FBO Gouri Indulkar," both of which shared one taxpayer identification number; "Anil Indulkar retirement trust FBO Anil Indulkar" and "Anil Indulkar A PC retirement trust FBO Gouri Indulkar," both of which shared a second taxpayer identification number; "Vinod Kaura A PC retirement trust FBO Vinod Kaura" and "Vinod Kaura A PC retirement trust FBO Veena Kaura," both of which shared a third taxpayer identification number; and "Vinod Kaura MD retirement trust FBO Vinod Kaura" and "Vinod Kaura MD retirement trust FBO Veena Kaura," both of which shared a fourth taxpayer identification number.

settle the San Diego Action in exchange for a promise that Veena would drop the Indian criminal complaint. Accordingly, Anil settled the lawsuit for receipt of $5,000.

Thereafter, East Desert filed a 2004 tax return reflecting the same ownership interests as previously, except that the 20 percent share previously shown as belonging to Samantha Kaura was then reflected as belonging to Claire Kaura. Subsequent tax returns do not reflect any Indulkar ownership interest in East Desert.

In November 2006, East Desert refinanced the loan on the property for $2.6 million, without the consent of the Indulkars. The Indulkars did not receive any share of the loan proceeds or an accounting of profits.

In January 2007, the Indulkars demanded the issuance of shares in East Desert to reflect their ownership interest and also demanded an accounting. On April 25, 2008, Anil Indulkar, in his capacity as trustee of each of the four retirement trust interests, filed the Present Action.

As noted previously, respondents filed two motions for judgment on the pleadings and/or nonsuit. One was based on the defense of res judicata and the other was based on the defense of the statute of limitations. Those two defenses had been bifurcated. The court granted both motions, on the respective grounds of res judicata and the statute of limitations, and entered judgment in favor of respondents. In its judgment the court stated appellant "could and should have litigated any claims he had in the San Diego action" and "any such claims were long barred by the statute of limitations."

II

DISCUSSION

A. *Standard of Review:*

"'The purpose of Code of Civil Procedure section 631.8 is "to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact." [Citation.] Under the statute, a court acting as trier of fact may enter judgment in favor of

5

the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.] In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence. [Citations.] [¶] On appeal, we view the evidence in the light most favorable to the judgment, and are bound by trial courts' findings that are supported by substantial evidence. [Citation.] But, we are not bound by a trial court's interpretation of the law and independently review the application of the law to undisputed facts. [Citation.]' [Citation.]" (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 487.)

*B. Res Judicata:*

*(1) General principle—*

"'Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties . . . .'" (*Estate of Redfield* (2011) 193 Cal.App.4th 1526, 1534.) It bars "'not only . . . issues that were actually litigated but also issues that could have been litigated.' [Citation.]" (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 226.) "Application of the doctrine of res judicata requires an affirmative answer to the following three questions: (1) Was there a final judgment on the merits? (2) Was the issue decided in the prior adjudication identical with the one presented in the subsequent litigation? (3) Was the party against whom the principle is involved a party . . . to the prior adjudication? [Citation.]" (*Estate of Redfield*, *supra*, 193 Cal.App.4th at p.1534.)

Appellant concedes there was a final judgment on the merits in the San Diego Action. However, he maintains that the issues determined in the San Diego Action were not identical to the ones raised in the Present Action and that the party against whom the principle of res judicata is being applied in the Present Action was not involved in the San Diego Action. We disagree, for reasons we shall show.

6

*(2) Same issue—*

*(a) comparison of primary rights*

As appellant observes, the San Diego Action asserted causes of action for the imposition of constructive and resulting trusts, partition, quiet title, declaratory relief, dissolution of East Desert, fraud, and conversion. In the Present Action, the causes of action are for breach of fiduciary duty, constructive fraud, breach of contract, declaratory relief and the issuance of corporate shares. Appellant maintains that, given the different causes of action raised in the two lawsuits, the second prong of the res judicata test is not met and the doctrine should not be applied. Not so.

"To determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have 'consistently applied the "primary rights" theory.' [Citation.]" (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797.) "'In California the phrase "cause of action" is often used indiscriminately . . . to mean *counts* which state [according to different legal theories] the same cause of action . . . .' [Citation.] But for purposes of applying the doctrine of res judicata, the phrase 'cause of action' has a more precise meaning: The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced. [Citations.]" (*Id.* at p. 798.)

Yet in making his argument, appellant focuses on the legal theories asserted. He loses sight of the primary rights at stake.

In the San Diego Action, the Indulkars asserted there was an oral agreement to form East Desert and to allocate to them a 50 percent ownership interest in the company. They further alleged that East Desert acquired the Mollison Elms property in 1994. The Indulkars repeatedly alleged that, notwithstanding the agreement, they had "never been issued the agreed upon stock in Defendant EAST DESERT," they had been denied access to the books and records of East Desert, and they had been denied their 50 percent share of the profits of East Desert and of the Mollison Elms property. In

7

addition, the Indulkars alleged that $2.4 million in equity was drained off the Mollison Elms property when East Desert took out a loan in that amount, but that they were denied their share of that equity, that is, their share of the loan proceeds.     Via the San Diego Action, the Indulkars sought to secure for themselves their respective interests in East Desert and the Mollison Elms property.  More particularly, they sought a dissolution of East Desert, together with an accounting and a division of corporate assets, and the receipt of their 50 percent share in the Mollison Elms property.

The primary rights at stake in the action before us are the same.  In the first amended complaint, appellant asserts that the parties' intent was for the Indulkar trusts to own 49.738 percent of East Desert and for the Kaura trusts to own 50.262 percent.  He further alleges that East Desert acquired the Mollison Elms property in 1994, and in 2004, obtained a $2.4 million loan on the property.  Appellant also asserts that the loan proceeds were used to acquire another property, title to which was not taken in the name of East Desert.

In addition, appellant asserts that he has not received his East Desert share certificate, and seeks the issuance of the same.  He further alleges that respondents breached their fiduciary duties by refusing access to the books and records of East Desert and refusing to account to him.  He claims respondents engaged in constructive fraud in denying him his rights to East Desert and East Desert's interest in the Mollison Elms property, and his right to a return on his investment.  Inasmuch as the parties agreed to "nearly equal" ownership of East Desert, appellant characterizes respondents' failure to afford him the benefits of that ownership as a breach of contract.  He seeks declaratory relief regarding the parties' rights and interests in the Mollison Elms property and "the effect of the various instruments relating to the Property."

In short, both lawsuits were predicated on the same basic facts:  (1) an agreement to form East Desert with an approximately 50/50 ownership interests; (2) the purchase of Mollison Elms by East Desert; (3) the failure to issue stock certificates to

8

appellant representing his ownership interest in East Desert; (4) the failure to provide appellant with any profits of either East Desert or Mollison Elms; and (5) the failure to distribute any of the equity from the $2.4 million refinance to appellant. The primary rights at issue in each action were the rights to the ownership interests in East Desert and Mollison Elms, and the rights to profits or equity therefrom, including equity withdrawn from Mollison Elms via the refinance.

Appellant could recast his causes of action ad infinitum, but the primary rights at stake in both actions would still be the same. Indeed, appellant acknowledges that "the nucleus of facts is the same" in each action, but he maintains that because the causes of action are different, his claims in the Present Action are not barred. He cites several cases, most notably *Agarwal v. Johnson* (1979) 25 Cal.3d 932 (disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4) and *Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, in support of his position.

*Agarwal v. Johnson*, *supra*, 25 Cal.3d 932 involved litigation commenced by a terminated employee. His supervisor had uttered a racial epithet towards him and he had been informed that he was being terminated because of lack of job knowledge and lack of cooperation. After his termination, he searched for another job for more than a year, but was informed that his former employer had given him an unfavorable recommendation. (*Id.* at pp. 941-943.) The terminated employee filed two lawsuits against his former employer. In a federal court action, he asserted both individual and class claims, for racial discrimination, based on title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). In a state court action, he asserted causes of action for defamation, intentional infliction of emotional distress, and interference with business relations. (*Agarwal v. Johnson*, *supra*, 25 Cal.3d at pp. 944, 954-955.)

Before the state court action was fully resolved, the federal court entered judgment in favor of the employer in the civil rights case. The employer asserted that the employee's claims in the state court action were barred by the doctrine of res judicata.

9

The state court rejected this contention. It observed that the two lawsuits arose out of the same underlying facts, but that they were based on different primary rights. One lawsuit was based on the federal statutory right to be free from discriminatory employment practices. The other lawsuit was based on common law rights to be free from defamation, intentional infliction of emotional distress, and interference with business relations. (*Agarwal v. Johnson*, *supra*, 25 Cal.3d at pp. 954-955.)

According to appellant in the Present Action, *Agarwal v. Johnson*, *supra*, 25 Cal.3d 932 shows that just because the San Diego Action and the Present Action both arise out of the same set of underlying facts, that does not mean the causes of action asserted in the Present Action are barred. However, unlike the plaintiff in *Agarwal*, appellant here has not shown that he has both a statutory right to be free from one type of harm and distinct common law rights to be free from other types of harm. Rather, all of his causes of action are based on two basic harms suffered: (1) the failure of respondents to give appellant his share of East Desert and its profits; and (2) the failure of respondents to give him his share of the profits and equity of Mollison Elms. (See *Le Parc Community Assn. v. Workers' Comp. Appeals Bd.* (2003) 110 Cal.App.4th 1161, 1172-1173.)

In *Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th 327, suit was brought against a corporation, its marketing manager, and certain others. Judgment was entered against the marketing manager, but not the corporation. (*Id.* at pp. 332-334.) The marketing manager brought a motion for indemnification based on Corporations Code section 317. (*Id.* at p. 335.) The appellate court held there was no basis for indemnity under the statute, because the marketing manager was not sued as an agent for the corporation, but was sued as an individual pursuing his own personal interests. (*Id.* at p. 337.)

The marketing manager then filed a separate lawsuit against the corporation, for breach of oral, written, and implied-in-fact contracts for indemnity, for

10

breach of the duty to indemnify under Labor Code section 2802 and Corporations Code section 317, for breach of the duty of good faith and fair dealing, and for equitable estoppel. (*Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th at p. 335.) The corporation asserted that the lawsuit was barred by the doctrine of res judicata. The marketing manager conceded that the statutory causes of action were barred, but argued that the other causes of action were not. (*Id.* at p. 338.) The court agreed, for several reasons. (*Id.* at pp. 343-345.)

First, it stated: "[T]he primary right to seek authorization for indemnity under Corporations Code section 317 is not the same cause of action as one for breach of a contract for indemnity . . . or one asserted under the doctrine of equitable estoppel. The statute merely accords agents of corporations the right to seek authorization for indemnity against adverse judgments rendered against them for their reasonable and good faith acts on behalf of the corporation. Contractual indemnity, in contrast, accords the contracting party a right to indemnity pursuant to the terms of the contract. Similarly, breach of [the]implied covenant of good faith and fair dealing gives rise to contract remedies and in addition, to tort remedies when the breaching party also 'seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.' [Citations.] [¶] We hold therefore that [the marketing manager's] application for an order under Corporations Code section 317 involves a different primary right than those asserted in these causes of action." (*Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th at pp. 343-344.)

Second, the *Branson* court observed that the marketing manager's claim for equitable estoppel and contractual claims were not recoverable on a motion under Corporations Code section 317 in the first lawsuit. (*Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th at p. 344.) Third, it said there was "an even more compelling reason why the determination of the motion under Corporations Code section 317 [was] not res judicata on the causes of action under examination in the [second] suit . . . ."

11

(*Id.* at p. 345.)  As the court noted, section 317, subdivision (g) specifically provides "that it does not 'affect any right to indemnification to which persons other than directors and officers may be entitled by contract or otherwise.'  [Citation.]"  (*Ibid*, fn. omitted.)

The matter before us is distinguishable.  In the San Diego Action, the Indulkars sought declaratory relief in the form of a determination that they held a 50 percent ownership interest in East Desert.  The Indulkars also sought the dissolution of East Desert and the winding up of its affairs due to the failure to issue stock and to pay them 50 percent of the corporate profits.  They settled these claims and others for the sum of $5,000.  Thereafter, appellant filed the Present Action rehashing the same injuries and seeking, inter alia, the issuance of a share certificate for his approximate 50 percent interest in East Desert and damages for breach of the contract to afford him the benefits of a near-50 percent interest in East Desert.

True, after appellant settled the San Diego Action, he found a statute (of dubious application) on which to base his demand for the issuance of a share certificate—Corporations Code section 416.[3]  However, unlike the situation in *Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th 327, there was no reason why appellant could not have raised the statute in the first lawsuit—the San Diego Action, which squarely addressed his right to an ownership interest in East Desert.  As we have previously stated, the doctrine of res judicata bars "'not only . . . issues that were actually litigated but also

_____

3           Corporations Code section 416, subdivision (a) provides in pertinent part: "Every holder of shares in a corporation shall be entitled to have a certificate signed in the name of the corporation . . . , certifying the number of shares and the class or series of shares owned by the shareholder. . . ."  Section 416, subdivision (b) continues: "Notwithstanding subdivision (a), a corporation may adopt a system of issuance, recordation and transfer of its shares by electronic or other means not involving any issuance of certificates . . . ."  Query how that statute is even applicable to East Desert—a Nevada corporation.  (See Corp. Code, §§ 102, subd. (a) [California General Corporation Law applies to certain domestic corporations], 167 [definition of domestic corporation].)

12

issues that could have been litigated.' [Citation.]" (*Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th at p. 226.)

And again, it has been observed: "'As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. . . . It must therefore be distinguished from the *legal theory* on which liability for that injury is premised: "Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief." . . . The primary right must also be distinguished from the *remedy* sought . . . .' [Citations.]" (*Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 577.)

With regard to East Desert, the injury was the failure to issue stock certificates documenting appellant's interests in the corporation and to distribute his share of the corporate profits. That injury was expressly described in the complaint in the San Diego Action. In that action, the Indulkars sought the remedies of declaratory relief and dissolution. In the Present Action, appellant has come up with another remedy with respect to the same injury—an order compelling issuance of the certificates. He doesn't get a second bite of the apple just because he thought of a new remedy.

*(b) scope of settlement agreement*

Interestingly, appellant claims that the settlement agreement did not encompass his claims to East Desert, that he only released his claims to its property—Mollison Elms. He does not explain what value an interest in East Desert would have if it excluded the right to receive profits from Mollison Elms.

Anyway, we observe that the settlement agreement contains several descriptions of the matters released. Paragraph D of the recitals states: "The parties now wish to resolve all claims alleged in the [San Diego] Action by the dismissal of the Action as to all parties, with prejudice . . . ." Similarly, paragraph No. 1 of the operative provisions says: "Kaura has paid to Indulkar the total sum of $5,000.00 in full satisfaction of all claims by Indulkar against them relating to the facts alleged." The

13

language of these two paragraphs is plain enough, broadly encompassing both claims to East Desert and claims to Mollison Elms, inasmuch as claims to each were raised in the San Diego Action.

Appellant, however, emphasizes another portion of the settlement agreement, which he says shows a contrary intention. Paragraph No. 2 of the operative provisions states: "Except for the obligations of Kaura, Kalra and East Desert contained in this Settlement Agreement, in any other settlement agreement between the parties and any other agreement between the parties . . . , Indulkar does hereby . . . release and forever discharge Kaura, Kalra and East Desert, . . . from any and all . . . claims of every kind . . . based in whole or in part on any act or omission by Kaura, Kalra and/or East Desert, which only relate to the claims asserted in the action as they pertain to the Mollison Elms Property and the Courtyard Villas Property."

According to appellant, this means that, contrary to the plain language of paragraph D and paragraph No. 1, he did not release his claims to East Desert. Rather, he only released his claims to the property it owned, Mollison Elms, as well as to a different property. Under this interpretation, he sought to gut the settlement agreement by saying in two paragraphs that all claims were resolved, which would include claims to both East Desert and Mollison Elms, and in a third paragraph that he retained a claim to the profits of Mollison Elms, by way of a claim to its owner—East Desert. However, we can give effect to all provisions of the settlement agreement by construing the language of paragraph No. 2 to mean that the Indulkars released all claims to East Desert and the property it owned, but retained claims relating to other properties the parties owned that were not mentioned in the settlement agreement, such as their water park in India.

This interpretation is supported by the following language from paragraph No. 6 of the settlement agreement, which provides: "Nothing contained in this Settlement Agreement shall be construed to operate as a release . . . of any claims . . . Indulkar may have against Kaura, Kalra, East Desert or any third party for any liability

14

. . . which may be asserted against Indulkar . . . which relates in any way to acts or omissions of any person regarding the operation . . . of the Mollison Elms Property . . . after *the release by Indulkar of* their interest in the Mollison Elms Property and *their interest in East Desert.*" (Italics added.) This language plainly shows the Indulkars intended to release both their claims to the Mollison Elms property and their claims to its owner, East Desert.

Appellant insists this is not true, because the 2004 tax return of East Desert, which was filed in 2005, after the date of the settlement agreement, showed that appellant owned an interest in East Desert in 2004. Yes, but the settlement agreement, by which the Indulkars released their interest in East Desert, was signed in 2005. So, while they owned an interest in East Desert in 2004, as reflected on the 2004 tax return, they released that interest in 2005 in exchange for the sum of $5,000. Although appellant maintains that the release was made under duress, he did not, as the trial court observed, seek to rescind the settlement agreement because of that duress.

### *(c)  subsequent facts*

"As a cause of action is framed by the facts in existence when the underlying complaint is filed, res judicata 'is not a bar to claims that arise after the initial complaint is filed.' [Citations.]" (*Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th at p. 227.) Appellant maintains that not all of the same primary rights were at stake in the San Diego Action, because some of them did not arise until after the date the settlement agreement was signed. He offers two examples. First, he mentions the 2004 tax return. He says that it shows that respondents, after the time of the settlement, acknowledged that he owned an interest in East Desert. To the contrary, it only shows that appellant owned an interest in East Desert in 2004, before the date of the settlement.

Second, appellant says the Mollison Elms property was refinanced for $2.6 million in 2006, after the date of the settlement, and that he did not receive his share of

the loan proceeds, or equity from the property. It does not matter that the $2.6 million refinance took place in 2006. Appellant had already unequivocally and forever released his interests in the Mollison Elms property via the settlement agreement. Any claim derived from the ownership of the Mollison Elms property is res judicata.[4]

        *(3) Privity—*

        "The concept of privity for the purposes of res judicata or collateral estoppel refers 'to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel. [Citations.]' [Citations.] '"This requirement of identity of parties or privity is a requirement of due process of law." [Citation.] "Due process requires that the nonparty have had an identity or community of interest with, and adequate representation by, the . . . party in the first action. [Citations.]"'" (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1069-1070.) "A party is adequately represented for purposes of the privity rule 'if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action. [Citation.]' [Citation.] We measure the adequacy of 'representation by inference, examining whether the . . . party in the suit which is asserted to have a preclusive effect had the same interest as the party to be precluded, and whether that . . . party had a strong motive to assert that interest.'" (*Id.* at pp. 1070-1071.)

---

[4]      As an aside, we observe that the first amended complaint in the Present Action makes no mention of the $2.6 million refinance that took place in 2006 and, obviously, seeks no relief based upon it. It attacks only the $2.4 million refinance that took place in 2004 and was previously raised in the San Diego Action.

Appellant says privity is lacking between the plaintiffs in the San Diego Action and the plaintiffs in the Present Action, for two reasons:  (1) in the San Diego Action, the Indulkars sued in their individual capacities whereas in the Present Action Anil Indulkar is suing as trustee of four retirement trusts for the benefit of himself and Gouri; and (2) the Indulkars were under duress when they settled the San Diego Action. We start with the issue of capacity.

*(a)  capacity*

The fact that Anil Indulkar did not identify himself as trustee in the San Diego Action is not determinative of the privity issue.  This is because "'. . . it is unnecessary for the trustee in the pleadings . . . to describe himself as trustee.  He can proceed in the action as though he were the owner of the claim which he is enforcing.  If he does describe himself as trustee the description is treated as surplusage. . . .'  It was not necessary for the plaintiff to describe himself as trustee." (*McKoin v. Rosefelt* (1944) 66 Cal.App.2d 757, 769.)  In other words, "the [Indulkars] could maintain an action in their own name, i.e., without mentioning the trust.  [Citation.]" (*Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, 171, disapproved on another ground in *People v. Rogers* (2013) 57 Cal.4th 296, 330-331.)

Thus, in the San Diego Action, Anil Indulkar could have enforced the trusts' rights with respect to both East Desert and the Mollison Elms property it owned even though he had not mentioned the fact that he was trustee of the trusts.  Moreover, the Indulkars as individuals and as beneficiaries of the trusts had as strong an interest as Anil as trustee in asserting those rights.  Consequently, there was no lack of privity. (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.*, *supra*, 60 Cal.App.4th at pp. 1069-1071.)  Were the rule otherwise, a person could always file one lawsuit without mentioning his or her status as trustee, obtain a settlement, and then file an additional lawsuit in his or her capacity as trustee, seeking more.

17

*(b)  duress*

Appellant nonetheless maintains there was no privity, because he and Gouri Indulkar settled the San Diego Action under duress.  He cites *Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th 210 in support of his position.  In that case, Friends of the Santa Clara River (Friends), a nonprofit organization, filed an action challenging an environmental impact report (EIR) certified in 1999.  (*Id.* at pp. 221, 224.)  The appellate court directed the issuance of a writ vacating the certification of the EIR.  It further directed the trial court to retain jurisdiction over the matter until a legally compliant EIR was certified.  (*Id.* at p. 221.)  After a second EIR was certified in 2004, the Planning and Conservation League (PCL) and the California Water Impact Network (CWIN) filed separate actions, challenging the 2004 EIR.  (*Id.* at pp. 218, 224.)

Friends then dismissed its action with prejudice.  When doing so, Friends explained that while it believed that the 2004 EIR did not comply with either the writ or the law, it chose not to pursue a challenge to the 2004 EIR because of monetary constraints.  The entity that had certified the EIR's filed demurrers in the consolidated actions brought by PCL and CWIN, claiming the actions were barred by the doctrine of res judicata.  (*Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th at pp. 222, 224.)  The trial court overruled the demurrers, having concluded that the doctrine of res judicata did not apply, inasmuch as PCL and CWIN were not in privity with Friends.  (*Id.* at pp. 224, 226.)

In addressing the issue of privity, the appellate court stated:  "As Friends undertook its action on behalf of the public, the key question regarding privity is whether Friends adequately acted as appellants' '"virtual representative"'  [Citation.]"  (*Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th at p. 230.)  In determining "whether Friends asserted the common interest with adequate vigor," the court considered, inter alia, "the manner in which Friends conducted and

18

resolved its action." (*Ibid.*) It stated that "when a party's conduct in an action shows a lack of incentive or resources to litigate a common interest . . . privity is not established. [Citation.]" (*Id.* at p. 231.) It observed that ". . . Friends terminated its action through a voluntary dismissal, not through a settlement." (*Ibid.*) The court further observed that Friends thought the 2004 EIR was defective, but lacked the resources to challenge it. Under the circumstances, the court could not infer that the parties were in privity. (*Ibid.*)

At the same time, the appellate court noted that there was an issue whether Friends, PCL and CWIN had colluded in forum shopping. It said that the pleadings and judicially noticed facts gave rise to conflicting inferences about Friends' motive for dismissal, and that the trial court had not resolved the conflict, which could not be resolved on demurrer. (*Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th at pp. 231-232.) The court declined to make the factual resolution for the first time on appeal. (*Id.* at p. 232.) In short, it concluded that the trial court had properly overruled the demurrers. (*Id.* at p. 233.)

Skipping over the portions of *Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th 210 about the lack of a settlement and possible collusion, appellant in the Present Action emphasizes the portion of the case having to do with vigorous representation. Anil Indulkar as trustee, appearing in the Present Action, says that he and Gouri Indulkar, appearing in their individual capacities in the San Diego Action, dropped that lawsuit because of duress. Therefore, he reasons, they as individuals, in furtherance of their interests in East Desert and the Mollison Elms property, did not provide Anil Indulkar as trustee, with adequate representation in the San Diego Action. Consequently, he says, privity is lacking.

This overlooks the facts that Anil Indulkar was representing not only his own interests but also the trusts' interests in the San Diego Action whether he identified himself as trustee or not, that he should have resolved in that action all claims that could have been resolved based on the scenario in question, and that the duress would have

19

been inflicted on him equally in his individual capacity and in his capacity as trustee. (*Hassoldt v. Patrick Media Group, Inc.*, *supra*, 84 Cal.App.4th at p. 171; *McKoin v. Rosefelt*, *supra*, 66 Cal.App.2d at p. 769; *Planning & Conservation League v. Castaic Lake Water Agency*, *supra*, 180 Cal.App.4th at p. 226.) Focusing for a moment exclusively on Anil Indulkar in his undisclosed capacity as trustee, if he settled the San Diego Action under duress, he could have sought to rescind the settlement. However, as the trial court in the Present Action observed, the Present Action does not include a cause of action for rescission based on duress, and does not contain an offer to return the settlement funds in exchange for rescission of the settlement agreement.

## C. Attorney Fees:

Appellant argues the court erred in awarding in attorney fees to respondents based on an attorney fees clause contained in the settlement agreement. The record on appeal does not contain a copy of the order in question. Appellant explains that the order "was entered after [he] designated this record, but the register of actions contains the applicable minute order."

A review of the record shows that the judgment in this matter was entered on December 6, 2012. The notice of entry of judgment was served on January 2, 2013. Respondents filed a motion for attorney fees 14 days later. The motion was denied by minute order on February 19, 2013. Thereafter, on February 28, 2013, appellant filed a notice of appeal from the judgment.

After appellant filed his notice of appeal, respondents, on March 1, 2013, filed a motion for reconsideration of their attorney fees motion. The register of actions reflects that the court ruled on the motion on April 11, 2013, about six weeks after the notice of appeal from the judgment was filed.

The notice of appeal in this matter was directed to the judgment. The postjudgment order awarding attorney fees was separately appealable. Any challenge to

20

that award required the filing of a separate notice of appeal. This court has no jurisdiction to entertain a challenge to the attorney fees award. (*Golightly v. Molina* (2014) 229 Cal.App.4th 1501, 1519-1521.)

Even if that were not the case, we would not consider appellant's argument. As appellant himself points out, no copy of the order awarding attorney fees is contained in the record on appeal. Although the register of actions shows that the court ultimately ruled in favor of respondents on their motion for reconsideration and their request for attorney fees, it also shows that the court ordered the preparation of a formal order. The record on appeal does not contain a copy of a formal written order and the register of actions does not even indicate whether such an order was ever filed. (See *Walton v. Mueller* (2009) 180 Cal.App.4th 161, 167 [appeal must be taken from formal written order where court directed one to be prepared].) It is the burden of the appellant to provide an adequate record for review and he has failed to do so here. (*Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, 1362.)

As a separate matter, we notice that respondents, in the conclusion to their brief, request attorney fees on appeal. We decline to consider their request due to their failure to comply with the California Rules of Court requiring noticed motions (Cal. Rules of Court, rules 3.1702(c), 8.54(a)) and separate topic headings (Cal. Rules of Court, rule 8.204(a)(1)(B); *Conservatorship of Hume* (2006) 139 Cal.App.4th 393, 395, fn. 2). We do so without prejudice to their filing a proper motion in the trial court. (Cal. Rules of Court, rule 3.1702(c).)


*D. Appellate Procedure:*

In concluding our opinion, we must admonish counsel for both parties for their failure to adhere to appellate procedure and the California Rules of Court. In addition to the points mentioned in our discussion of attorney fees, we observe that each party to this appeal provides vast expanses of briefing unsupported by record references.

Moreover, those record references that are provided often span great numbers of pages without pinpoint page references. This is sanctionable conduct. (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 165-167.) Moreover, we may treat any point unsupported by pinpoint page references as forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.) Ironically, in his reply brief, appellant both recognizes the inadequacy of respondents' record references and calls attention to the same, but fails to recognize that he has provided equally deficient record references. Counsel should familiarize themselves with the California Rules of Court and comply with the rules of appellate procedure in the future.

## III

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

22